**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Todd Hoover, et al., | No. CV-18-01309-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Ocwen Loan Servicing LLC, | |
| Defendant. | |

Plaintiffs William Todd Hoover and Leonida Martinez Hoover, (collectively, "the Hoovers"), brought this action against Defendant Ocwen Loan Servicing, LLC ("Ocwen") for breach of contract, breach of the covenant of good faith and fair dealing, declaratory judgment, fraud, and misrepresentation. (Doc. 1.) The Hoovers allege Ocwen and its predecessor in interest breached a loan modification agreement between the parties. The Hoovers also allege that Ocwen and its predecessor made intentional or negligent misrepresentations in the loan modification agreement and subsequent documents. Ocwen moved for summary judgment on all claims. For the following reasons, Ocwen's motion for summary judgment, (Doc. 23), is granted.

**BACKGROUND**

In April 2006, Plaintiffs William Todd Hoover ("Mr. Hoover") and Leonida Martinez Hoover ("Mrs. Hoover"), husband and wife, purchased real property located at 2204 West Blaylock Drive in Phoenix, Arizona (the "Property").[1] (Doc. 24 at 5–6.) The

---
[1] Unless otherwise noted, factual statements included in the Court's summary are undisputed.

1 Hoovers obtained a loan for $420,000.00 from GreenPoint Mortgage Funding, Inc. ("GreenPoint"), secured by a deed of trust encumbering the Property. (Docs. 23-1 at 8; 24 at 9.) GreenPoint subsequently assigned the beneficial interest in the deed of trust to GMAC Mortgage, LLC ("GMAC"), the predecessor of Defendant Ocwen. (Doc. 24 at 36.)

According to the promissory note, executed on October 2, 2006, the Hoovers were to make initial monthly payments in the amount of $1,350,89, which was subject to change. (Doc. 23-1 at 9.) The promissory note provides: "My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owed at the monthly payment date in full . . . . If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month." (Doc. 23-1 at 9.) Under the terms of the promissory note, the amount of the Hoovers' initial monthly payments was less than the amount of the interest portion of the monthly payments, and fully amortizing payments were not to begin until December 1, 2011. (Docs. 23-1 at 9; 26 at 7.)

Beginning with the first payment due, the principal balance of the loan increased monthly. (Doc. 23-1 at 41–42.) However, the Hoovers apparently did not know the principal was increasing. Mr. Hoover testified that despite the terms of the promissory note, he and his wife were "unaware [they] had a negative [adjustable rate mortgage]," and incorrectly believed they were making payments sufficient to reduce the principal balance. (Doc. 26-1 at 7.) By April 2009, the Hoovers had become aware they had a "negative ARM loan" and submitted a loan modification request. (Doc. 23-1 at 52.) In a statement explaining hardship, Mr. Hoover wrote: "We owe $500,000. Our mortgage payment is what they call a negative ARM loan. We have only been able to make the minimum payment because of the loss of income. Every month we pay the minimum

they increase the amount we owe on the home." (Doc. 23-1 at 55.) The parties agree that in April 2009, the principal balance was $451,003.13. (Docs. 23-1 at 57; 26 at 3.)

On December 17, 2009, after the Hoovers participated in a trial plan for loan modification, GMAC sent a letter to the Hoovers offering a "Home Affordable Modification Agreement." (Doc. 23-1 at 63.) The letter stated: "To further reduce your mortgage payment, we will defer collection of and not collect interest on $117,275.34 of your outstanding principal. You will not be required to make monthly payments on that portion. This portion of principal will be due when you pay off the modified loan, which will be when you sell or transfer an interest in your house, refinance the loan, or when the last scheduled payment is due." (Doc. 23-1 at 64.) The letter further stated: "[W]e will forgive a portion of your outstanding principal equal to $0.00." (Doc. 23-1 at 64.) The "new principal balance" would include "[a]ny past due amounts as of the end of the trial period, including unpaid interest, real estate taxes, insurance premiums, and certain assessments paid on your behalf to a third party." (Doc. 23-1 at 64.) Enclosed with the letter was a loan modification agreement ("Modification Agreement"), which the Hoovers were to sign and return in order to accept the offer.

Approximately a week later, the Hoovers executed the Modification Agreement. (Doc. 23-1 at 66.) The Modification Agreement sets forth three figures that are central to the parties' dispute: (1) the new principal balance,[2] (2) the deferred principal balance, and the (3) interest-bearing principal balance, as of January 2010. Pursuant to the Modification Agreement, the new principal balance is the sum of the deferred principal balance and the interest-bearing principal balance. (Doc. 23-1 at 67.) The amount of the deferred principal balance is undisputed: "$117,275.34 of the New Principal Balance shall be deferred (the Deferred Principal Balance) and [the Hoovers] will not pay interest or make monthly payments on this amount." (Doc. 23-1 at 67.) The Hoovers still owed

---

[2] The Court uses the terms "new principal balance" and "principal balance" interchangeably, with the understanding that the December 2009 principal balance was "new" because the Modification Agreement recalculated the principal balance to include amounts past due and to exclude unpaid late charges.

this money, but they did not have to pay interest on it and did not have to pay it off until they had paid off the rest of the balance.

The parties dispute the amounts of the interest-bearing principal balance and the new principal balance. The Modification Agreement contains provisions that are apparently inconsistent. Section 3(B) states the "New Principal Balance" was $342,287.62 in January 2010, more than $100,000 less than the principal balance in April 2009. (Doc. 23-1 at 67.) Ocwen claims this is a typographical error: the new principal balance should have been $459,562.96, which reflects the sum of the old unpaid principal balance prior to the modification, interest, and escrow. (Doc. 23-1 at 4.) According to Ocwen, the stated new principal balance of $342,287.62 was actually the interest-bearing principal balance at the time, not the total principal balance. (Doc. 23-1 at 73.) Indeed, Section 3(D) provides an identical number as the interest-bearing portion of the principal balance: "The New Principal Balance less the Deferred Principal Balance shall be referred to as the 'Interest Bearing Principal Balance' and this amount is $342,287.62." (Doc. 23-1 at 67.) If Ocwen is correct that the numbers in Section 3(D) are accurate, then adding $342,287.62 (the interest-bearing principal balance) to $117,275.34 (the deferred principal balance) makes a total of $459,562.96—the amount that Ocwen claims was the true new principal balance. (Doc. 23-1 at 73.)

The Hoovers have a different understanding of the Modification Agreement. They believe that under the Modification Agreement, the "principal balance [was] $342,287.62 and they were supposed to subtract the $117,275.34 from the amount for the deferred principal balance." (Doc. 26-1 at 7.) Under the Hoovers' interpretation, the Modification Agreement "specifically reduced the principal balance" to $342,287.62 and there is no typographical error in Section 3(B). (Doc. 25 at 12.) Rather, the error is in Section 3(D). According to the Hoovers, the interest-bearing principal balance consequently should have been $225,012.28—reflecting $342,287.62 (the new principal balance) subtracted by $117,275.34 (the deferred principal balance)—rather than the $342,287.62 number in Section 3(D). (Doc. 26 at 4.) The parties were apparently

unaware of their differing interpretations of the Modification Agreement and the Hoovers proceeded to make monthly payments on the loan in accordance with GMAC's calculations.

In March 2010, about three months after executing the Modification Agreement, the Hoovers commenced a Chapter 7 bankruptcy proceeding in the United States Bankruptcy Court for the District of Arizona. (Doc. 33.) In connection with the bankruptcy proceeding, both parties made representations about the principal balance of the loan that were inconsistent with their own interpretation but consistent with that of their opponent. In a motion for relief from automatic stay, GMAC stated that as of January 1, 2010, "the principal balance due and owing under the Note is in the approximate amount of $342,287.62." (Doc. 26-1 at 26.) GMAC qualified its statement with the following: "This is an approximate amount for purposes of this Motion only, and should not be relied upon as such to pay off the subject loan as interest and additional advances may come due[.]" (Doc. 26-1 at 26.) The Hoovers, on the other hand, submitted schedules representing they owed $459.000.00 to GMAC for the home loan. (Doc. 33 at 31.) According to the Hoovers, they believed that at the time of the bankruptcy, they owed $342,287.62—minus any payments they had made since executing the Modification Agreement—but they were not aware of how their attorney had "[come] up with the amounts listed." (Doc. 26 at 9.)

From June 2011 until February 2013, GMAC sent the Hoovers monthly mortgage statements. (Doc. 23-1 at 80–100.) The June 2011 statement advised the principal balance was $451,026.86, and each subsequent monthly statement showed a decrease in the principal balance as the Hoovers were steadily paying off a portion of the principal. (Doc. 23-1 at 80–100.) The February 2013 statement set forth the principal balance as $440,687.38. (Doc. 23-1 at 100.) On February 6, 2013, GMAC and Ocwen jointly sent a letter to the Hoovers, notifying them that Ocwen was taking over in collecting the monthly payments and the most recent principal balance was $323,412.04—Ocwen asserts this number reflected the interest-bearing principal balance, which the Hoovers

dispute. (Docs. 23-1 at 5, 102; 26 at 6.) Following the transfer of servicing, Ocwen sent the Hoovers monthly statements from March 2013 until November 2013. (Doc. 23-1 at 105–113.) During that time, the stated principal balance on the mortgage statements continued to steadily decrease, from $440,189.87 in March 2013 to $435,684.01 in November 2013. (Doc. 23-1 at 105–113.) While the Hoovers admit each monthly statement stated a principal balance over $430,000.00, Mr. Hoover testified that he and his wife never opened the mortgage statements because they made payments by phone. (Doc. 26-1 at 9.) As such, the Hoovers maintained their belief that they owed significantly less than the amount in the statements. (Doc. 26-1 at 9.)

On February 9, 2016, the Hoovers requested a payoff quote for the loan. (Docs. 23-1 at 5; 26 at 6.) Ocwen provided a payoff quote and stated the total amount due was $422,574.26. (Doc. 23-1 at 116.) According to Mr. Hoover, this was the first time the Hoovers realized "there was a potential problem between what [they] believed the mortgage to be and what the bank believed the mortgage balance to be." (Doc. 26-1 at 9.) When the Hoovers inquired about the difference, Ocwen sent them a letter explaining the Modification Agreement contains a typographical error that mistakenly states "the New Principal Balance as the interest-bearing amount." (Doc. 26-1 at 35.) The letter further advised: "3(B) is revised to state the New Principal Balance amount of $459,562.96." (Doc. 26-1 at 35.)

The Hoovers sued on March 28, 2018, alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, declaratory judgment, fraud, and misrepresentation. (Doc. 1-3 at 7–11.) On December 7, 2018, Owen moved for summary judgment on all claims.[3] (Doc. 23.)

---

[3] The Hoovers argue that summary judgment should be denied because Ocwen's statement of facts in support of summary judgment violate Local Rule 56.1(a), which requires that "[e]ach material fact in the separate statement must be set forth in a separately numbered paragraph." (Doc. 26 at 1.) According to the Hoovers, Ocwen improperly filed an affidavit attaching exhibits rather than a statement of facts. The Court rejects this argument. Although Ocwen labeled its filing as an affidavit, it is functionally identical to a separate statement of facts.

**LEGAL STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment, all evidence must be construed in the light most favorable to the non-moving party.

**ANALYSIS**

**1. Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Declaratory Judgment**

The Hoovers allege that Ocwen "breached its contractual agreement with [them] by failing to apply the payments pursuant to the Loan Modification Agreement." (Doc. 1-3 at 7.) According to the Hoovers, Ocwen should have calculated and applied their monthly payments in accordance with an interest-bearing principal balance of $225,012.28. (Doc. 25 at 8.) As discussed above, the Hoovers reached the $225,012.28 number because the Modification Agreement defines the interest-bearing principal balance as the difference between the new principal balance and the deferred principal balance, and the Hoovers' position is the new principal balance was $342,287.62. (Doc. 25 at 8.) The Hoovers further allege that Ocwen's conduct also breached the covenant of good faith and fair dealing. (Doc. 1-3 at 8.) Relatedly, the Hoovers also "seek a declaratory judgment requiring [Ocwen] to 1) apply all overpayment to principal each month, 2) recalculate the monthly payments based on the terms of the Loan Modification Agreement, and 3) adjust payoff based on the terms of the Loan Modification Agreement." (Doc. 1-3 at 8.) Ocwen replies that it did not breach the Modification Agreement because it correctly applied the Hoovers' monthly payments to an interest-bearing principal balance of $342,287.62. (Doc. 32 at 6.)

On its face, the Modification Agreement contains conflicting provisions: Section 3(B) states the new principal balance was $342,287.62 while Section 3(D) states the interest-bearing principal balance was also $342,287.62. (Doc. 23-1 at 67.) These two provisions cannot both be accurate, because it is undisputed that the difference between the principal balance and the interest-bearing principal balance should be $117,275.34. (Doc. 23-1 at 67.) The Hoovers admit the two provisions conflict and urge an interpretation under which Section 3(B) would control. (Doc. 25 at 5–6.) Ocwen, on the other hand, argues Section 3(B) contains a typographical error and Section 3(D) should control. (Doc. 23 at 7.)

Viewing the evidence in the light most favorable to the Hoovers, the Modification Agreement is not reasonably susceptible to the Hoovers' interpretation. *See Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 765 (D. Ariz. 2013); *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997) ("Only if the ambiguity could be [resolved in a manner consistent with the non-moving party's claim] would summary judgment be denied."). In interpreting a contract, a court must "attempt to 'ascertain and give effect to the intention of the parties at the time the contract was made.'" *ARA Inc. v. City of Glendale*, 360 F. Supp. 3d 957, 964 (D. Ariz. 2019). When a contract contains conflicting provisions, "[t]he court should look to parol evidence to determine what the parties intended the conflicting provisions to mean." *International Broth. Of Elec. Workers, AFL-CIO Local 47 v. Southern California Edison Co.*, 880 F.2d 104, 107 (9th Cir. 1989); *see Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154 (Ariz. 1993) ("The better rule is that the judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties."). "The determination of the parties' intent must be based on objective evidence, not the hidden intent of the parties." *Tabler v. Indus. Comm'n of Ariz.*, 202 Ariz. 518, 522 (Ariz. Ct. App. 2002).

The Hoovers' interpretation that the Modification Agreement modified their loan by reducing the principal balance is plainly inconsistent with evidence in the record. (Doc. 25 at 12.) It is undisputed that in April 2006, the Hoovers initially took out a loan for $420,000.00, and the principal balance on that loan increased on a monthly basis for approximately three years. (Doc. 23-1 at 8.) By April 2009, the principal balance was $451,003.13. (Doc. 23-1 at 57.) At that time, the Hoovers knew their principal balance had increased, as shown by Mr. Hoover's hardship letter to GMAC: "Our mortgage payment is what they call a negative [ARM] loan. We have only been able to make the minimum payment because of the loss of income. Every month we pay the minimum they increase the amount we owe on the home." (Doc. 23-1 at 55.) The Hoovers do not allege—and have not produced any evidence showing—that when they signed the Modification Agreement in December 2009, they had made payments sufficient to reduce the principal balance by more than $100,000.[4] Rather, they assert the Modification Agreement "specifically reduced the principal balance" by $117,275.34, impliedly arguing the parties intended the agreement to forgive a portion of the loan. (Doc. 25 at 12.) The Hoovers point to no evidence indicating the parties intended to reduce the principal balance or forgive a portion of the loan. Rather, they argue their own "understanding of the loan modification was that GMAC would subtract the $117,275.34 deferred principal balance from the new principal balance of $342,287.62 and [they] would only be making payments on the difference." (Doc. 25 at 6.) However, their subjective understanding of the Modification Agreement is irrelevant in the face of objective evidence to the contrary. *See Tabler*, 202 Ariz. at 522.

The admissible evidence in the record indicates the parties did *not* intend for the Modification Agreement to forgive any portion of the loan. Section 3(D) defines the new principal balance to "include all amounts and arrearages that will be past due (excluding unpaid late charges) less any amounts paid to the Lender but not previously credited."

---

[4] Although Mr. Hoover testified that a principal balance of $342,287.62 "looked correct" in December 2009, he could not provide a reasonable explanation for why the balance would suddenly decrease by more than $100,000 on their negatively amortizing loan. (Doc. 26-1 at 7.)

- 9 -

(Doc. 23-1 at 67 (emphasis added).) Although Section 3(D) states the new principal balance as $342,287.62, no provision in the agreement provides for loan forgiveness. The explicit intent to not forgive any portion of the balance can be found in GMAC's December 2009 letter, to which the Modification Agreement was attached. The letter advised that it represented GMAC's offer to modify the mortgage loan and that "[t]o accept this offer," the Hoovers were to sign and return the enclosed Modification Agreement—which they did. (Doc. 23-1 at 64.) The letter also explicitly informed the Hoovers that GMAC "will forgive a portion of your outstanding principal equal to **$0.00**." (Doc. 23-1 at 64 (emphasis added).)

The terms of Section 3(D) further support that there was no intention to reduce the principal balance. As described above, Section 3(D) states the deferred principal balance was $117,275.34 and the interest-bearing principal balance was $342,287.62. (Doc. 23-1 at 67.) It also includes a chart of the Hoovers' "payment schedule for the modified Loan," showing the interest rate, monthly principal and interest payment amount, and total monthly payments. (Doc. 23-1 at 67.) The parties do not dispute the figures in the chart were calculated based on an interest-bearing principal balance of $342,287.62. (Docs. 23-1 at 3; 26 at 4.) Ocwen is correct that aside from the stated new principal balance in Section 3(B), the rest of the Modification Agreement is consistent with the numbers in Section 3(D). (Doc. 23-1 at 4.)

Under Arizona law, "where there is an inconsistency between general provisions and specific provisions of a contract . . . the specific provisions ordinarily qualify the meaning of the general provisions." *Marshall v. Patzman*, 81 Ariz. 367, 369 (Ariz. 1957). In *Marshall*, the Arizona Supreme Court considered a contract to purchase stocks. "The purchase price named in the contract [was] $12,500 which both parties . . . agreed upon." *Id.* However, the buyer was to pay through various means, and another provision in the contract stated the specific amounts of each expected payment. *Id.* The court determined "the aggregate of [the] amounts" of each payment was "$16,502.68 and not $12,500." *Id.* It then concluded that $16,502.68 was the purchase price intended by the

parties—despite the contract's stated purchase price of $12,500—because the provision that "specifically stat[ed] the various amounts exacted of [the buyer], as payment for the purchase of said stock, being specific in its nature, is controlling." *Id.* at 370.

Similarly, Section 3(D) of the Modification Agreement is more specific and therefore controlling. While Section 3(B) states the total principal balance, Section 3(D) addresses the specific subcomponents of the total balance: the deferred principal balance of $117,275.34 and the interest-bearing principal balance of $342,287.62. (Doc. 23-1 at 67.) Section 3(D) also explicitly defines the relationship between the figures, explaining "[t]he new Principal Balance less the Deferred Principal Balance shall be referred to as the 'Interest Bearing Principal Balance.'" (Doc. 23-1 at 67.) Moreover, Section 3(D) includes a chart of the Hoovers' monthly principal and interest payment amounts, and those figures were specifically based on an interest-bearing principal balance of $342,287.62. (Doc. 23-1 at 67.) The Hoovers admit the interest and payment amounts were calculated in accordance with Ocwen's interpretation of the Modification Agreement, but argue the calculations were incorrect. (Doc. 25 at 8.) Because of the specific nature of Section 3(D)—which includes the subcomponents of the principal balance as well as the calculated amounts of monthly payments—the Court concludes Section 3(D) controls to the extent it conflicts with Section 3(B), and the parties intended the interest-bearing principal to be $342,287.62 under the Modification Agreement.

Because no reasonable factfinder could conclude the parties intended the Modification Agreement to reduce the principal balance to $342,287.62, summary judgment is granted to Ocwen on the Hoovers' breach of contract claim. Since the Hoovers' response to summary judgment treats their claim of the breach of the covenant of good faith and fair dealing as identical to their breach of contract claim, summary judgment is also granted to Ocwen on the Hoovers' claim for breach of the covenant of good faith and fair dealing. (Doc. 25 at 4–9.) Finally, because the Hoovers' claim for declaratory judgment requests the Court to adopt their incorrect interpretation of the

1 Modification Agreement, summary judgment is granted to Ocwen with respect to this
2 claim as well.

### 2. Fraud and Misrepresentation

The Hoovers brought additional claims for fraud and misrepresentation, but conflate the two in their response to summary judgment. (Doc. 25 at 9–13.) Although the Hoovers have not clearly explained their misrepresentation claim, the Court notes misrepresentation can refer to either fraudulent misrepresentation or negligent misrepresentation. *See Pettay v. Ins. Mktg. Servs, Inc. (West)*, 156 Ariz. 365, 367–68 (Ariz. Ct. App. 1987). According to the Hoovers, Ocwen misrepresented—either with the intent to deceive or because they failed to exercise reasonable care—the amount of the new principal balance in the Modification Agreement and subsequent documents. (Doc. 25 at 11.)

Ocwen argues that the statute of limitations bars the Hoovers' fraud and misrepresentation claims. (Doc. 23 at 9.) In Arizona, the statute of limitations is three years for fraud, including fraudulent misrepresentation, and two years for negligent misrepresentation. *See* A.R.S. § 12-543(3); *Hullett v. Cousin*, 204 Ariz. 292, 297 (Ariz. 2003). For both types of claims, the statute of limitations begins to run when "the plaintiff knows, or in the exercise of reasonable diligence should have known, of the defendant's" fraudulent or negligent conduct. *Barnett v. Lincoln National Life Insurance Co.*, No. CV-12-2160-PHX-SMM, 2014 WL 4259482, at *9 (D. Ariz. Aug. 28, 2014); *Coronado Development Corp. v. Superior Court of Arizona In and For Cochise County*, 139 Ariz. 350, 352 (Ariz. Ct. App. 1984).

Here, the statute of limitations bars the Hoovers' fraud and misrepresentation claims. Even assuming the amount of the principal balance can be construed as a misrepresentation, the Hoovers should have known by March 2013, at the latest, that Ocwen and/or its predecessor GMAC made those alleged misrepresentations. This action was commenced on March 28, 2018, approximately five years later. (Doc. 23 at 10.) From June 2011 until February 2013, GMAC sent the Hoovers monthly statements

reflecting their principal balance was between $451,026.86 and $440,687.38. (Doc. 23-1 at 4.) After Ocwen took over in February 2013, it continued to send the Hoovers monthly statements. From March 2013 until November 2013, the monthly statements reflected the principal balance was between $440,189.87 and $435,684.01. (Doc. 23-1 at 5.) In other words, among the dozens of monthly statements that the Hoovers received from 2011 until 2013, every single one stated the principal balance was approximately $100,000 higher than what the Hoovers believed it was, or the alleged misrepresentation of $342,287.62.

The Hoovers do not dispute they received the monthly statements containing evidence of the alleged misrepresentation. Nor do they allege that Ocwen concealed the alleged misrepresentation. Rather, they assert "they did not open or review their monthly mortgage statements because they made their mortgage payment automatically by phone every month." (Doc. 25 at 10.) As a result, they "did not become aware that there was a difference between what they believed the mortgage balance to be and what [Ocwen] believed the mortgage balance to be until [they] requested a loan payoff quote from [Ocwen] in February 2016." (Doc. 25 at 10.) This argument addresses only when the Hoovers actually learned of the alleged misrepresentation, and not when they "should have known or could have discovered [it] with reasonable diligence." *Frame v. Cal-Western Reconveyance Corp.*, No. CV-11-0201-PHX-JAT, 2011 WL 3876012, at *5 (D. Ariz. Sept. 2, 2011). While the Hoovers do not argue that they exercised reasonable diligence, the Court concludes a reasonable person would have opened and reviewed their monthly mortgage statements and inquired about any perceived errors or discrepancies. The Hoovers' alleged failure to *ever* open their monthly statements cannot excuse their failure to bring this action within the statute of limitations.

Accordingly,

**IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 23) is **GRANTED**.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment against Plaintiffs.

Dated this 13th day of August, 2019.

_____
Honorable Roslyn O. Silver
Senior United States District Judge